Next case on today's docket is the case of In the Interest of D.B, a Minor v. Christy B. We have Sean Featherstone, who's part of the appellant, and we have Rebecca McCorbett, who's part of the appellate. You may begin, Mr. Featherstone. Is it Featherstone? Featherstone. Featherstone. Good morning. Good morning. May it please the court. Counsel, my name is Sean Featherstone. I'm one of the public defenders here in Jefferson County, have been for a couple of years. I'm here representing Christy B. She is the respondent biological mother of the minor child D.B. This appeal pertains really to two court orders, the first of which was an adjudicatory entered on September 3rd of 2010, finding neglect injurious environment based on three separate allegations, which I'll address in turn. And the second order was the dispositional order entered on January 14th, 2011. That order allowed for the removal of the minor child D.B. to her father's residence in North Carolina. First, with respect to the adjudicatory order, I made some issue in my brief that there were no findings of fact in the written order as required. Certainly think that that would have been beneficial in this case for review. But just to be clear, I'm not asking that the matter be remanded to provide those findings of fact. It's our argument that there are no facts on the record that would substantiate the adjudication in the first instance. And we are asking for an outright reversal of that adjudication. The state's first allegation of injurious environment was inadequate supervision. The state alleged that Christy B. left the minor child in the home for extended period of time on more than one occasion when her whereabouts were unknown. And I try to piece through that as if there are different elements, the first of which would be that she left the minor in the home. That's not what the record says. The record says the minor child came home at six o'clock, was met by her 15-year-old sister who was in the home, and then went to her neighbor's, Charity Becker York, who was a frequent, routine caregiver for this child. That's where the minor child remained until the police come to the home sometime between 10 and 11 p.m. Really what we're talking about is a four to five hour period of time during which Ms. Boswell was missing in action. And the police came because wasn't there another sibling that went to the police station and said my mom's not home? Yes, there are two older siblings, C.H. and A.B. C.H. was a male minor, age 14. A.B. was a female minor, age 15. A.B. is the one who's in the home babysitting. At some point in the evening, the children become concerned. They don't know where their mother is. And C.H. walks to the police department, and I argued before the trial court and argue here that there's nothing neglectful about a 14-year-old boy walking several blocks in the city as long as it's not past curfew. And he did. He walked to the police station to inquire as to where his mother was if she was there. She wasn't there. Is there anything in the record that indicates why if this car incident, the breakdown occurred at noon, that she didn't call until 10 p.m.? Yes, she testified that as soon as the children get out of school at 4 o'clock, she testified that she tried to call C.H. and that that 4 o'clock time is when she first realized that she was going to be unable to communicate with the kids until she got back. That was in her testimony at the adjudicatory hearing. It was not? It was. There was a cell phone problem instead? She testified that the cell – her testimony was she didn't plan on being gone all day, that she specifically asked if they were going to be able to get her home by 6 o'clock and was indicated to her that she would be. She said that the – she didn't take a charger because she didn't think she was going to be gone that long. So I first quarreled with the fact that they alleged that she was left at home anyway, D.B., because she wasn't there. She was at the neighbor's house. I also quarreled that this was an extended period of time. As I've stated, there's – with respect to C.H. and A.B., they get out of school at 4 o'clock. D.B. is a little younger, and she has an after-school program that keeps her until 6 o'clock. So it wouldn't have been anticipated or expected – her mother wouldn't have been required in any event until 6 o'clock, and she's home between 10 and 11. But this wasn't the only occasion. Well, that was my next argument, is that it was the only occasion. There was some testimony from DCFS caseworker that the minor children had reported that she had been gone elsewhere, but there is no detail anywhere in the record about when this is alleged to have occurred or for how long it was alleged to have occurred. Frankly, I do argue that that's the only time on the record, February 18, 2010, where there was a problem with Ms. Boswell's caregiving, if you determine that was a problem. I'm not so sure that it's a problem for a mother to be gone for four hours when we're talking about teenage kids of this age. I certainly fended for myself on more than one early evening when I was 14 or 15 until 10 o'clock. I mean, to me, that wasn't something that shocked my sense of parental responsibility, and I hope that it doesn't shock this court. The state also alleged that her whereabouts were unknown. That's the only time the record reflects these kids didn't know where they were. I don't know what else I could say about that. This is one incident that led these kids to be in care, and it's worth mentioning when Officer Matthew Gordon responds to the home, Christy's there and the children are there, he leaves. I mean, he leaves her there with the kids and says, have a good night. DCFS comes in the next day, begins their investigation, which ultimately resulted in shelter care being taken and the orders entered that I'm here with respect to. One provision with respect to this supervision I have to draw attention to is 705 ILCS 405-2-3, which provides that you can't leave kids under 14 without supervision for an extended period of time. I argued that before the trial court because by implication what it says is there's nothing wrong with leaving the 14- and 15-year-old alone. 14- and 15-year-olds stay at home and house-sit when their parents go on vacation. But with respect to Dee Dee, her siblings would have certainly been old enough to care for her in the mother's absence. Illinois, unfortunately, doesn't have an established age at which a sibling is allowed to care-give or to babysit. Some states do have that provision, but I would certainly submit that 14- and 15-year-olds, especially under the facts of this case, were suitable caregivers. And it's worth noting on that that there's no testimony on the record that there were any ever problems when A, B cared for the minor or when the neighbor cared for the minor. The only bad parent incident we have is that Christy B. was out of touch for four or five hours. So that's the first allegation is supervision. The second one, and one that frankly I think was the one driving this case throughout, was the allegation of mother's drug usage. That's what this case, in my opinion, was about. And I was trial counsel. They alleged that she had a drug usage problem that interfered with her ability to parent. And that's an important prong in this analysis that we do. I argued before the trial court there's a wide body of law on divorce, best interests. You have to show how substance abuse, whether it's alcohol or illegal drugs, you have to show how that affects the ability to parent before it becomes relevant on a best interest determination. It's my position that the Juvenile Court Act has codified that. And they say you have to prove not only the drug usage but show how it affected their ability to parent. In this case, we have no evidence that there were any problems with these children or the care given to these children until February 18, 2010. There's no testimony they weren't going to school. There's no testimony they were out running the streets picking up criminal charges. And, sure, there is no evidence that her ability to parent was ever affected. Was there evidence that she admitted to drug use? Vanessa Shaw, a DCFS investigator, testified that when, on February 19, she and the officer interviewed Ms. Boswell. Their position was that she admitted she had used drugs one week prior. That was the state's evidence against Christy. Christy denied, first of all, that she had made that admission. She said they discussed her cocaine usage when she was 16 years old and that somehow that had been twisted. The more important part for this appeal is that's all Vanessa Shaw testified to, was that she admitted drug uses one week prior. There was no testimony as to where the children were. If she used drugs a week prior when she was on vacation and the kids were out of town in a different place, it's my position that's not neglect. Is it bad parenting? Certainly. I would not look any of you in the eye and say it's okay to use illegal drugs. But I would say it is not neglect to use illegal drugs unless you can show that that illegal drug usage has affected the ability to parent. There's not one bit of evidence that the kids ever observed her high. There's no evidence the kids ever observed her with drugs in her possession. If her substance abuse had so taken over her life that she couldn't any longer function as a parent, presumably that evidence would have been before the court, the trial. There was evidence that she did not complete a substance abuse rehab program. She did not. And that she tested positive for, I guess, cocaine. That's all post adjudication. Yes. After the adjudicatory hearing, there was testimony that she had failed two drug tests, I think, in that period of time. But my response to that is it wasn't presented at the adjudicatory hearing. I mean we can't very well use as evidence to sustain an adjudicatory order what was done after that order was entered. At the time of the adjudicatory hearing, there had been no evidence like that presented. So you're saying it's totally immaterial and I'm kind of combining, I guess, Tyrone, the kids, or Taco, or whatever. Taco, yes. Colorful. The boys, I mean the children say he's the boyfriend and she says no. But, I mean, they're both apparently there's plenty of evidence from the kids that they're doing drugs and possibly selling drugs out of the home. You're saying that makes no difference at all. I would quarrel that that's what the children said. There's a difference in this case between what Investigator Shaw reports the children said and what they actually testified to at the hearing. If you look at what the children testified to at the hearing, they testify they never saw drugs. The closest we get to testimony from the children that hurt Christy was that on one occasion the children had seen scales in the residence, in the kitchen when Taco was there. And by implication were to infer that these were scales that were being used to weigh illegal drugs that are never seen. I thought that there was testimony from the older daughter that she thought her mom was… Actually, DB testified that she thought her mother had used drugs. She speculated that maybe moms used drugs. And that Taco was selling drugs. I think she thought that that was a possibility. I can't recall what her exact words were, but my response to that is that that's pretty far from unequivocal testimony that something is true. If Taco was a drug dealer, where's the conviction for a drug felony? Where's the police officer who arrested him, the people who purchased drugs from him? There's nothing on the record about who Tyrone Shannon is other than what the state said basically through hearsay exceptions at shelter care. The shelter care position is, well, Christy admitted he was an illegal drug dealer. That's not what Christy testified to. Christy testified that she said there was no personal knowledge of hers that Taco had ever sold illegal drugs. But when confronted by Officer Brands, who says he's a drug dealer, what's he doing watching your kids? She said, well, he wouldn't do that here. And the whole thing gets twisted. They try to say she said, well, I know he's a drug dealer, but he doesn't do it at home or in my home. She says, no, I don't know that, but I certainly haven't seen any evidence of that. I think the record is woeful with respect to the allegation that Tyrone Shannon was a drug dealer. That's not something we just say. That's something we can prove. If he's a drug dealer, there are people, there are police officers, and there are convictions to verify that. And that was not done. But with mother's drug usage interfering with her ability to parent, it is clear that we don't have any indication she was ever high around those children. The judge says, well, I find that interfered with her ability to parent on February 18, 2010, regardless of whether or not she used cocaine that day or not. That was Judge Overstreet's comment from the bench as he was explaining this ruling, which I found remarkable. It doesn't matter to him whether or not she used drugs on February 18, 2010, when it's their allegation that she was using drugs and that it interfered with her ability to parent. There was no evidence that somebody is still impaired seven days later from cocaine usage. There was no evidence that it still affects your ability to make decisions in a rational manner seven days after usage. If they had disclosed that evidence in discovery, I certainly would have rebutted it. I've had those cases of aggravated DUIs, and when the judge says it doesn't matter whether or not she used on February 18, 2010, it's clear it didn't matter to him. But it's my position before this court that it absolutely does matter. They never showed she was impaired on February 18. As a matter of fact, Officer Gordon testified during his conversation with her he did not suspect impairment. She comes home. The state would have you believe she's been out on this drug-ridden binge all day on February 18. But she comes home. The officer doesn't see any signs of impairment, and he leaves. He goes home. And then DCFF comes in the next day, and here we are. And the guardian ad litem and CASA both recommended return to mom. CASA recommended return to mom that day. I think the guardian ad litem's recommendation was that the kid stay with grandmother until she completed her substance abuse counseling and then go home. But both were certainly against the move to North Carolina, which, you know, the dispositional record's not nearly as lengthy as it would have been had I thought that was a possibility walking in. And maybe that's a lesson learned on the young lawyer not to rely on what the GAL and CASA are going to recommend at a dispositional hearing. But I've never seen a case where the decision at dispo parted so starkly from what was being recommended by those people who had been appointed by the court to speak as to that child's best interest. So in sum, on the drug usage, there's no evidence of that prior to this February 18, 2010 issue. We've already touched on Tyrone Shannon. I do think I need to mention she didn't testify. It was a boyfriend, and the children didn't. That's how DCFS spun their reports and their allegations out of the gates. But that wasn't the evidence that was presented. Ms. Boswell testified that Tyrone Shannon had a child her age or her oldest son's age, and she would buy clothes from him, that he would bring his son over, and they would all play video games together. Didn't testify that this was a boyfriend or a paramour, and matter of fact, denied that. And I say the no evidence of illegal drug sales on the part of Mr. Shannon. She testified she had no knowledge of that. Officer Brands and Vanessa Shaw say contrary. The whole case is Vanessa Shaw says the minor children and Christy B. reported, and then the minor children and Christy B. get up and testify that's not what they said. That was exactly how this hearing went down in the trial court. It was obvious that the trial court judge did not believe the testimony of the children at the adjudicatory hearing and did not believe Respondent Christy Boswell. Unfortunately for this. Yes. Yes. He certainly is. And I don't have any trouble believing that at all. My problem is that the 705 ILCS 405 slash 2-18 subsections 4C, what the children said to Vanessa Shaw, allegedly, that's not enough to support this adjudication without corroboration. And there is none of that. All we have in this case is, well, the kids said. Christy says, no, I didn't. It's as if you put my client on the stand and you ask them, did you do this? And they say no. And then you say your denial is so uncredible that I'm not going to believe you and I'm going to find against you. That is exactly what happened on this case. And as a matter of law, I hope that that is rejected. Obviously, the potential for abuse by DCFS is a concern to me. If all they have to do is get up and say my client said that's going to be difficult for me to ever have any good results in an adjudicatory hearing when they don't have to corroborated with other evidence. It'd be one thing if there was evidence other than what the children said or what Christy said. There is no evidence of that. There's no observations of her stone. There's no observations of her with illegal drugs. There's no certified convictions of Tyrone Shannon's convictions. And there's no reasonable explanation for how it could be neglect to leave teenagers a home until 10 o'clock or 11 o'clock at night. Did she have prior convictions? Ms. B? No. I'm not aware of any prior criminal convictions. If there had been, I'm certain the state would have introduced those at trial. Of course, I'm not going to swear there weren't because I don't have that personal knowledge. But I would expect the state would have impeached her with those when she testified at the numerous proceedings in this case. Any prior juvenile cases involving this family? I failed to mention when I was talking about that no prior indicated reports or they would have been presented. The Juvenile Court Act provides that when we adjudicate a case, we can consider other prior indicated reports. There's no evidence of prior indicated reports. In the briefs, there's probably the state says that there's drug use, cocaine use since she was 16 years old by the mother. Was that something she reported? She testified that she had had some drug problems when she was younger. She testified her problem was more with prescription medicines. She had been in an accident or burned, I can't remember which one, and had become addicted to painkillers. That is true, but that is years prior to the conduct at issue in this case. I've pretty much covered the adjudicatory order. With the dispositional order, I know there are some procedural defects that the state concedes, but really what I object to is the substance that a minor child on this record, based on this adjudication, gets sent where she doesn't want to go, away from her siblings and away from her newborn niece. I think the record basically reflects the kid's crying about it. The judge says she's going to be upset when I tell her she's going to North Carolina, but she's going. The interesting part about that is the minor's testimony. Her father had only visited with her five times during the pendency of this case, each time when he was in Jefferson County for court. Not once did he take a trip up here to see her. She testified to Judge Overstreet in Chambers that her father would not even be here if it wasn't for this court case, and despite all that, he sent the kid to North Carolina. I certainly think that that was an error. I think that the children should have remained together, and I don't know what else I could say about that. I'm here to answer any more questions, but I think that's probably it for my argument in chief. Thank you, Mr. Fetleson. You have the opportunity to move on. Thank you. Mr. Harmon? Your Honors, Counsel, there were three bases that the people alleged that pertain to neglect. Injurious environment due to failure to supervise, injurious environment due to drug use, and injurious environment due to giving the children over to an improper caretaker. Now, an injurious environment is not something that's subject to a precise definition. It's something that can be determined by the case itself, the facts of the case itself. But it involves a breach of a parent's duty to provide a safe and nurturing shelter for their child, her child. And in this case, the people did prove that. Contrary to what the defendant says, there was testimony at trial by D.B. herself, in which she said that her mother would leave partially and then come back, and that the February 18th incident was not the first time that the mother had left her alone. And A.B. and C.H. And it is interesting, it is significant that the mother does not appeal the findings of neglect as pertaining to A.B. and C.H., but only appeals... Why is that wrong? Because a finding of neglect as to two children under the same circumstances that D.B. was neglected is probative of the fact that D.B. was neglected. She didn't admit any of it. No, but she's not appealing it. So that finding stands, and it is a finding of neglect as to A.B. and C.H., which she's not challenging. Where are they, the other two? You know, I don't know anything beyond the record, and at the end of the proceedings in the record, they were still in the grandmother's care, and the mother had visitation. And at that point in time, A.B. had given birth to an infant, and there were other problems going on. But there was evidence that D.B. gave at trial that indicated that the mother had left them alone on more than one occasion, had left them unsupervised on more than one occasion. And then, of course, there was the testimony of Shaw about everything that the children had explained. And I think it's also... The court did not credit the mother's testimony about the events on February 18th and did not credit her testimony about her cell phone being dead and not being able to call until 10 o'clock when they finally made it back to Mount Vernon. It did not credit any of that story. But what we do know is that the neighbor, Decker, when C.H. went to her and they were concerned because they couldn't find the mother and didn't know where she was, her first response was to call the police to see if she had been arrested. Now, you know, the underlying rationale for that would be that Decker had some knowledge that the mother was involved in something that could result in her arrest, and that's why she went looking for her first there. And then that's why C.H. walks up to the police department. So the children are left without proper supervision. And the issue is not whether D.B. could find an adult to care for her. That's not the issue. The issue is the mother made no provision, and she testified that she did not make any provision for the children's care. I mean, she did say that it was because she expected to be back, but she admitted she didn't make any provision for the children's care. So when they come home, there's no supervision. And in the end, D.B. ends up going over to Decker's house. But the fact that she could find someone to supervise her and she could find an adult to be with, that's not the same thing as that doesn't show that the mother provided proper supervision, and that's the ground. And she did not provide proper supervision in her absence. Can't a 15-year-old be an appropriate supervisor? Under the law, certainly, we may have babysitters that are 15. That's probably a fitting age. That's true. But nonetheless, I mean, that's where the court's finding that is not being challenged is that A.B. is neglected because there was a failure to supervise her. But we can't bring that into this case. Yeah, it's a finding in the same case. The facts are so different. She's with her mom's mother. They're with their grandmother. Isn't that right? Aren't the other two children with the grandmother? Yeah, but not on February 18th when there was a failure to supervise her. I understand that. But you raise the fact that they didn't appeal that. Yeah, but what I'm saying is that's a finding of neglect as to two other siblings that remain standing and is unchallenged, and it is probative of the fact that D.B. is neglected under the same facts. That's my point. Anyway, there is also the fact that when Shaw and Gordon went to interview the children a couple of days later, they found a runaway female minor in the home. So there's also that circumstance as far as the failure to provide proper supervision is the fact that she leaves and there are other unsupervised runaway minors in the home. How old were they? Huh? How old were the other unsupervised minors? You know what it doesn't say? It just says that there was a runaway minor found in the home, and that runaway minor was returned to her parents. But as far as the age… And did this mother try to solicit this child to come into her house, or did this child just show up because he or she knew the other children? There's no explanation. So there's no relevant evidence to that, is there? Other than the circumstance that the mother had to have known that the minor was there. Well, anyway, the night that Gordon went on February 18th, that he accompanied the children back to the home, there was a male there, but he said he was not there to babysit. But that male is not identified. So there was DB's testimony and then also the testimony about the children's statements about being left alone, left unsupervised, that were in the record. And so DB's testimony that the mother would partially leave and partially come back and that she had… What does that mean to you? You know. Partially leave and partially come back. What the court took it as, and I think this is a reasonable inference from the child's testimony, is that all three children were trying to protect the mother. But DB couldn't quite bring herself to lie, so she would say she would partially leave and partially come back. And I think that's the way the court took it. The court thought the children were trying to protect the mother and toning down their testimony from the statements that they had made to Shaw. And I think that's what it means. And that's why the court said, in light of DB's testimony and the soft peddling of their statements, that he believed their statements that were made to Shaw, which indicated that they had been left unsupervised on more than one occasion. And overnight. Then there's also the circumstance of the mother's behavior when she returned while the officers were there on February 18th. She was uncooperative. She would not answer the questions. She was very defensive. And that night she didn't mention any problems about having car trouble. She made no explanation for her absence at all. So, you know, that all goes to leaving the children at home unsupervised, without proper supervision. DB testified as far as to the drug use. There were all sorts of statements that were made to Shaw detailing, DB detailed the mother's drug use and Tyrone Shannon's drug use and how they would use cocaine together and how she would get seeds out and take it and how the mother, when she was going to use cocaine, would go upstairs with a spoon. And this is how DB knew that she was going up and how she would crunch up pills. And Shaw opined that DB had an incredible amount of knowledge for her age about drug use. DB testified at trial that she'd never, like I said, and like the judge found, that they were soft peddling their statements. But DB couldn't quite bring herself to say that she didn't think her mother was using drugs. She said she'd never seen her mother use drugs, but she definitely thought she was doing, that something was going on with drugs and that she would talk about how her friends would come over. So there is some corroboration about the mother's drug use and then there's also the fact that the mother admitted, and this is the statement that the court credited,  a week before the February 18th incident. So there is some corroboration and there's some admission as to drug use. How did this affect her ability to parent? Well, it affected her judgment, and we're not talking about just being under the influence at the time, causing an inability of parent, but it had a long-term effect on her judgment in that she permitted, I mean, her drug use caused her children to have to leave the home. D.B. said that when her mother used drugs, she would just leave and go next door to the neighbors. She just couldn't be around it. So her use of drugs had the effect of causing an injurious environment so much so that D.B. had to leave. And you can make the deduction that her drug use impaired her judgment and that's partly why she left the children at home without proper supervision. It impaired her judgment in that she exposed her children to drug use and drug sales. And it impaired her judgment in that she exposed her children to the use of illegal drugs and how to use them. So those things are definitely true, whether or not she was under the influence all the time. As far as leaving them with an inappropriate caretaker, the mother admitted that she, at trial, I mean at the hearing, judicatory hearing, that she felt comfortable leaving her children with Tyrone Shannon, who, you know, the children had made statements, was dealing drugs and using drugs in their home. And whom she knew, or she thought, if he did sell drugs, this is the mother's statement, if he did sell drugs, he didn't do it in her house. So she, I mean, and then there's the statements to the effect that the mother and Tyrone had used drugs together. This goes to whether she knew he was an inappropriate caretaker. Yeah? What was the evidence that they had used drugs together? That was the statement of D.B. DeShaw. But, I mean, the mother knew he was an inappropriate caretaker, but she testified that she was comfortable leaving him, leaving the children with him, while she walked three blocks to Farm Fresh and back. But D.B.'s testimony was a little more revealing. She said that Tyrone was her buddy and that he was there every day and that sometimes he did babysit for them, but not very often, and just for a short time. Nonetheless, you know, duration, 15 minutes, a lot can go on. Whether or not it was a short time or a long time, there was evidence that she left the children with Tyrone Shannon and that he was an inappropriate caretaker. Now, as to the dispositional order, the court apparently made C.H. and A.B. wards of the court. The court did not make D.B. a ward of the court. And for that reason, the court had no authority to issue a dispositional order pertaining to D.B. And that part, the part of the court's order that made, that found the mother unfit as to D.B. alone and found D.B.'s father fit, that part has to be vacated because the court had no authority to issue a dispositional order over a child that was not a ward of the court. However, the court had D.B., who the court had adjudicated, neglected. The court had a mother, which at the time of the dispositional hearing, there was evidence that she hadn't complied with her drug testing. There was evidence that she had had dirty, she had failed urinalysis tests and that, you know, she had made some progress, but she hadn't made, she hasn't dealt with her drug dealing, her drug use issues. Now, the court could not return a child to a mother who was the source of neglect in an injurious environment. But the court had a father that had complied with all of the interstate checks and had an income and a stable home and a stable job and wanted to parent his child, who testified that in the year before, May 2009, he had had D.B. and she'd lived with him because of the mother's ongoing pattern of drug use. Now, short, because the court did not make D.B. a ward of the court, the parent's rights were superior. But at this point in time, the court could not return a neglected child to a mother who still had not dealt with her drug issues. What the court did was return D.B. to her father, who had the superior right as a biological parent. And so that is what the court did, and that was no abuse of discretion. It was no abuse of discretion to close out the case as to D.B. and to permit then the courts in North Carolina to settle issues of visitation and custody. And that is what the court did. But the court had no authority to find the mother unfit as to D.B. and had no authority to find the father fit as to D.B. because she was not a ward of the court. And so that portion of the court's order should be vacated. But the court's order finding D.B. neglected should be affirmed for the reasons argued. Unless there are any questions. Just a couple of things with respect to D.B. having been left for these mom coming back, leaving partially. I think she elaborated in her testimony that there was a statement made by D.B. about her doing mom stuff. I take doing mom stuff to mean grocery shopping, things like that. There was no evidence that those periods of time during which D.B. was left were extended periods of time or that the minor was in any danger because of that. With respect to the issue of not appealing the other children, it's kind of like the drug tests that occur after adjudication. If she had had other adjudicated neglect cases at the time of the adjudicatory  as evidence of her parenting. Obviously the fact that she didn't appeal an adjudication of an order wasn't available as evidence at the time of that hearing. To me that doesn't bear much discussion that that doesn't matter. What did the trial court say that justified after he failed to make D.B. a ward of the court that he was going to name the father guardian? What did the court say when he said I'm not making D.B. a ward of the court? He didn't say much of anything about that. He said what he was going to do, send the child to North Carolina and directed the state to prepare the order. I didn't look at that order until this appeal. I really don't have any reason or explanation for the procedural errors other than I love Judge Overstreet. He hasn't done a ton of these yet. Maybe it was just a procedural mistake that he made or maybe his mistake was in allowing the assistant state's attorney to draft his proposed order without looking at it a little more carefully and taking some time to do so. It's clear what he meant to do was send the child to North Carolina. He apparently didn't know he needed to make the child a ward of the court in order to do that. On remand, if he was given the chance, I'm sure that's what he would do. Was there any discussion that this child, who was 11 at the time of the incident, I don't know how old, 12, was not going to see her mother because there was no visitation? Yes, I said something about that. I don't know if it was on or off the record. I said something about visitation, and he said that he's going to leave it up to her to pursue this in North Carolina. I really feel like this is a case where she got stepped on. She's got an ex-husband who makes $140,000 a year. He gets a public defender in Jefferson County, Illinois, to represent him on what I'll call expedited child custody case, as it's turned out being. He gets a public defender to represent him. He gets his custody order, and now she's left to fend for herself and go hire a private attorney to go get visitation in North Carolina when the record is that she can't even afford gasoline to get back and forth from substance abuse counseling. She got stepped on. About the court not believing mom, obviously I'm maybe becoming a little cynical in my old age, but sometimes I feel like those are just buzzwords judges drop to protect the ruling on appeal. That's good and that's sufficient if there's other evidence. There's not other evidence in this case that the credibility determination substantiates. All we have is did Christy and the kids say this or didn't they? Because there's no direct evidence of drug use, of drug convictions, or of drugs being in that home. It's just a credibility dispute. Like I said, I could see that tipping things in the state's favor if there had been other evidence, but there just simply wasn't. What's some evidence, direct evidence of drug use? I mean, cushioning up pills? I'm back to the Juvenile Court Act provision that hearsay statements by the children to the investigator are not enough to substantiate an adjudication unless corroborated. There was no corroboration that the kids had ever seen anything crunched up and crumbled. That's what Vanessa Shaw said was said by the child. That's not what the child said she said. And there was no corroboration from any other witness that that's what was done. Where's Tyrone Shannon? Why wasn't he subpoenaed? Maybe he would have evoked his Fifth Amendment rights. Maybe he wouldn't have. There are other ways to prove a case other than Vanessa Shaw saying they admitted it and then them saying, no, we didn't admit that. And if the record was full of that other evidence, I could see this court affirming the adjudicatory order, but absent that evidence with it really being a he said, she said between DCFS and this family, I think the decision to break the family up was clearly in error. With the runaway, there was no evidence Christie had any knowledge of that. And the whole notion that the kids were trying to protect their mom, if that's true, that's because they hadn't had problems in their mom's care and they wanted to stay with her, if that's true. I'm not saying it is. I definitely know that you could look at this record and presume that, just like the judge did. You know, you may well think she was using drugs, but the kids were protecting her. There's just no evidence of problems prior to February 18th, 2010. If the kids were protecting her, it's because they wanted to stay with her because they haven't had problems because she's a good mom. DB described her as her best friend and testified she felt comforted when she was with her. So, thank you. Thank you, Mr. Featherstone. Thank you, Mr. McCormick. Thank you for your manner of advising. Thank you.